UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA

**REDACTED CIVIL MINUTES – GENERAL**

| Case No. | LA CV17-00308 JAK (AFMx) | Date | September 18, 2018 |
|---|---|---|---|
| Title | Jason Lust v. Animal Logic Entertainment US, et al. | | |

| Present: The Honorable | JOHN A. KRONSTADT, UNITED STATES DISTRICT JUDGE |
|---|---|
| Andrea Keifer | Not Reported |
| Deputy Clerk | Court Reporter / Recorder |

| Attorneys Present for Plaintiffs: | Attorneys Present for Defendants: |
|---|---|
| Not Present | Not Present |

**Proceedings:** **(IN CHAMBERS) REDACTED ORDER RE DEFENDANTS/COUNTERCLAIMANTS AND THIRD-PARTY COMPLAINANTS' MOTION FOR SUMMARY JUDGMENT, OR IN THE ALTERNATIVE, FOR PARTIAL SUMMARY JUDGMENT (REDACTED DKT. 90, SEALED DKT. 107)**

## I.   Introduction

Jason Lust ("Lust") brought this action against Animal Logic Entertainment LLC ("ALE LLC")[1] and Zareh Nalbandian ("Nalbandian") in the Los Angeles Superior Court. Dkt. 1. On January 13, 2017, ALE LLC and Nalbandian removed the action. *Id.* On April 21, 2017, Lust filed an amended complaint ("FAC" (Dkt. 19)). The FAC advanced claims for breach of written contract, breach of implied covenant of good faith and fair dealing, breach of fiduciary duty, fraud, declaratory relief and accounting. *Id.* On May 23, 2017, ALE LLC, Animal Logic LLC ("AL US") and Animal Logic Entertainment Pty Ltd ("ALE AU") (collectively "AL Parties") filed a counterclaim against Lust ("First Amended Counterclaim" (Dkt. 37)). On May 23, 2017, AL Parties filed a third-party complaint against SAJ Productions, LLC ("SAJ") ("Third Party Complaint" (Dkt. 38)). The First Amended Counterclaim and Third Party Complaint advance claims for breach of contract, tortious interference with contract and tortious interference with prospective economic advantage.

On March 5, 2018, Nalbandian and AL Parties filed a motion for summary judgment as to the FAC, First Amended Counterclaim and Third Party Complaint ("Motion" (Dkt. 90, redacted; Dkt. 107, under seal)). Lust and SAJ filed an opposition. Dkt. 109. Nalbandian and AL Parties filed a reply. Dkt. 120.

A hearing on these motions was conducted on June 18, 2018, and the matters were taken under submission. For the reasons stated in this Order, the Motion is **GRANTED IN PART**.

## II.   Factual Background

### A.   Background

---

[1] ALE LLC was erroneously identified as Animal Logic Entertainment US.

UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA

**REDACTED CIVIL MINUTES – GENERAL**

| Case No. | LA CV17-00308 JAK (AFMx) | Date | September 18, 2018 |
|---|---|---|---|
| Title | Jason Lust v. Animal Logic Entertainment US, et al. | | |

In Fall 2012, Lust and Nalbandian renewed contact. Declaration of Ron Funnell ("Funnell Decl."), Exs. N, DD; Dkt. 110-24, 37. After several months of discussions and negotiations, which occurred in part during a trip by Lust to visit Nalbandian in Australia, they executed a short-term agreement ("SFA") on March 14, 2013. Motion at 3–4. It provided that Lust would perform producing services to ALE LLC. Declaration of John Shaeffer ("Shaeffer Decl."), Ex. 1; Dkt. 91-1. Craig Emanuel ("Emanuel") is an attorney at the Loeb & Loeb law firm. He is counsel for AL Parties, and played a significant role in the matters underlying this dispute. Nate Greenwald ("Greenwald") of Creative Arts Agency represents the AL Parties. He was involved in many of the communications in connection with this dispute.

B.      Terms of the SFA

The SFA states that it "will form the basis of any longform contractual relationship executed between us." *Id.* at 2. The SFA "defines [Lust's] role and title as Producer," because "President of Production conveys a role as an employee and less as a producing partner" and "would also work against us in validating the contractor relationship." *Id.* The SFA provided for a two-year term commencing on February 1, 2013 but permitted either party to terminate the agreement by providing advance notice of four months. *Id.* It also stated that the agreement was "at will." *Id.* The SFA states that Lust's "services related to film, television, interactive, games, and other entertainment related media IP projects will be exclusive for the Term" and "Copyright and all related IP in the services [are] to be assigned to Animal Logic." *Id.* at 2–3. Specific pre-existing projects were exempted. *Id.* at 4.

The SFA provides that Lust is "contracted to Animal Logic" through Lust's company, SAJ, which is to be responsible for all employment-related taxes and required insurance policies related to Lust's services. *Id.* at 3. The SFA provides that Lust is to be paid advances of $220,000 per year, which are recoupable against his share of related producer fees and profit participation. *Id.* at 3. The SFA provides that Lust will receive 12.5% of producer fees for "all projects greenlit after [February 1, 2013], to which [Lust is] entitled to be attached," and an additional 12.5% for all such projects that are greenlit during the two-year term of the SFA. *Id.* The SFA provides Lust with an entitlement to 12.5% of ALE's profit share of "all projects greenlit after [February 1, 2013] to which [Lust is] entitled to be attached." *Id.* at 3–4.[2]

The SFA also provides that, "[i]n the event [the] contract with ALE is terminated for any reason or is not renewed after the initial term, [Lust] will still be entitled to be attached to . . . [enumerated] pre-existing ALE projects[] greenlit for production within a two (2) year period from the date of termination" and "All other projects agreed as commencing development after [February 1, 2013], greenlit for production within a five (5) year period from the date of termination." *Id.* at 4.

The SFA provides that Lust shall receive a credit of "'Producer' or 'Executive Producer,' subject to considerations such as qualification for Australian Producer Offset rebates, your level of involvement in developing existing ALE projects vs. new ones, and approval of financiers and distributors (if required)."

---

[2]  The profit participation is "prorated to reflect the actual provision of services to the production during the Term" for specified pre-existing ALE projects. Shaeffer Decl., Ex. 1; Dkt. 91-1 at 3.

UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA

**REDACTED CIVIL MINUTES – GENERAL**

| Case No. | LA CV17-00308 JAK (AFMx) | Date | September 18, 2018 |
|---|---|---|---|
| Title | Jason Lust v. Animal Logic Entertainment US, et al. | | |

*Id.* For the specified, pre-existing ALE projects greenlit for production after February 1, 2013 "to which [Lust is] entitled to be attached," ALE will "use best efforts to provide that [Lust] shall receive a credit no less than 'Executive Producer.'" *Id.* For all other projects greenlit for production after February 1, 2013 "to which [Lust is] entitled to be attached, [Lust] shall be accorded a credit no less than 'Executive Producer.'" *Id.*

C.      Two-Year Term of SFA: February 2013 to January 2015

During the two-year term of the SFA, Lust worked with Nalbandian and ALE LLC on several film projects. The only project "greenlit" for production during this time was *Peter Rabbit*, which was purchased by Columbia Pictures ("Columbia"), which is a subsidiary of Sony Pictures. *See* Nalbandian Dep. at 26:5–16.

In January 2014, emails were exchanged between Cornish, Emanuel and Greenwald regarding the proposed high-level terms they would be proposing to Columbia for structuring the *Peter Rabbit* transaction. Lust Decl., Ex. TT; Dkt. 110-9 at 3. This structure included two Producer credits on the film. *Id.* at 4. Lust was copied on these messages, but there is no evidence that he participated in the conception or drafting of these terms or otherwise contributed to the decision-making process.



On February 14, 2014, Greenwald sent an email to Emanuel, Nalbandian, Cornish and Lust comparing their proposed terms with the draft producer agreement. Lust Decl., Ex. TT; Dkt. 110-9 at 3. It stated that the agreement largely captured the proposed terms, but that "some items [] need to be corrected." *Id.* On February 20, 2014, Emanuel responded to all recipients stating that he would be reviewing the draft agreement and sharing comments shortly, including as to those issues identified by Greenwald. *Id.* at 2.

On February 28, 2014, one of Emanuel's colleagues sent an email to Columbia sharing the comments and proposed edits to the producer agreement. Lust Decl., Ex. WW; Dkt. 110-9 at 8. Nalbandian, Cornish, Greenwald and Emanuel were copied on the message; Lust was not. *Id.* On March 11, 2014, Emanuel sent a follow up email asking if Columbia had reviewed the proposed changes sent in the prior message. *Id.* at 7. That same day, an employee of AL Parties forwarded the email thread to Lust. *Id.* On March 12, 2014, Lust sent an email to Felicity Staunton and CC'd Nalbandian and Cornish, in which he requested that he be copied on all correspondence in the future and that they instruct Emanuel to do so moving forward. *Id.* at 6–7. Nalbandian promptly responded. He suggested that, to make communications more efficient, Cornish act as the primary point of contact for discussions with

UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA

**REDACTED CIVIL MINUTES – GENERAL**

| Case No. | LA CV17-00308 JAK (AFMx) | Date | September 18, 2018 |
| --- | --- | --- | --- |
| Title | Jason Lust v. Animal Logic Entertainment US, et al. | | |

Emanuel but acknowledging that "[o]f course you would be in the loop and should be / would be copied on correspondence." *Id.* Lust responded by requesting that they permit him to participate in the direct discussions with Emanuel and emphasizing his desire to be copied on all correspondence. *Id.* at 6.

Lust testified that he received and reviewed this draft on that date. Lust Dep. at 246:17–247:23; Dkt. 91-3.

On March 14, 2014, Columbia sent an email to Emanuel and Greenwald with its responses to the proposed changes to the producer agreement. Funnell Decl., Ex. XX; Dkt. 110-48 at 2. On March 15, 2014, Emanuel forwarded that message to Cornish and Nalbandian, stating that his initial review of the agreement showed that Columbia had accepted most of their proposed changes but that he would be doing a full review soon. *Id.* Emanuel also stated that they need to "clarify the relationship between Jason [Lust] and the company" in the agreement, which they could discuss after the weekend. *Id.* Another email from this time reflects that the issue was that the producer agreement incorrectly identified Lust as an employee of ALE LLC. Funnell Decl., Ex. ZZ, Dkt. 110-49 at 2.

On March 29, 2014, Emanuel sent an email to Cornish and Nalbandian stating that he had just discussed certain issues regarding the *Peter Rabbit* producer agreement with Columbia. Lust Decl., Ex. AAA; Dkt. 110-9 at 11. Specifically, it stated that they had discussed ALE LLC's "request to designate who the 'non-exclusive first priority' producer would be," and it was the position of Columbia that "on a creative level the person that they expect to be providing 'non-exclusive first priority' services is Jason [Lust] given that he is was [sic] the active party in helping get the project set up at the studio." *Id.* Emanuel also stated that "they are not supportive of our position that Animal Logic would have the right to designate who the 'first priority' producer would be," but that they "would be willing to agree that if Jason [Lust] was not available to perform services, that a replacement could be proposed by Animal Logic but such individual would have to be subject to the approval of the studio." *Id.*

On March 31, 2014, Emanuel sent an email to Cornish and Nalbandian attaching a proposed draft of a long-form agreement with Lust. Funnel Decl., Ex. AA; Dkt. 110-35. It set forth proposed terms and conditions as to the working relationship between Lust and ALE LLC. *Id.* It is undisputed that neither this version, nor any later version of it, was never executed.

On April 8, 2014, Emanuel sent an email to Nalbandian, Cornish and Lust asking that Lust execute the *Peter Rabbit* COE as soon as possible in light of the parallel request by Columbia in order not to slow down the film production. Lust Decl., Ex. DDD; Dkt. 110-10 at 4. Lust responded, stating that he appreciated the urgency and needed to confer with his attorney, Nalbandian and Cornish but that he would be executing it shortly. *Id.* On April 9, 2014, Lust sent an email to Nalbandian and Cornish stating that he would execute the *Peter Rabbit* COE, notwithstanding that his attorney had identified some issues in the COE and the SFA that he would prefer to have resolved prior to execution. Lust Decl., Ex. CCC; Dkt. 110-10 at 2. Lust also stated that he was also signing the COE because he did not want to

UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA

**REDACTED CIVIL MINUTES – GENERAL**

| Case No. | LA CV17-00308 JAK (AFMx) | Date | September 18, 2018 |
|---|---|---|---|
| Title | Jason Lust v. Animal Logic Entertainment US, et al. | | |

slowdown any progress on the film. *Id.*
Lust states -- and the AL Parties contest -- that at that time, Lust believed he was a Producer on *Peter Rabbit* and that Columbia expected him to serve in that role. Dkt. 114-1 ¶¶ 47-48.

Between April 9 and 11, 2014, Cornish and Nalbandian exchanged several emails regarding issues each had identified in his working relationship with Lust. Funnell Decl., Ex. ZZ; 110-50. Cornish stated that Lust had requested that a long-form agreement be executed, but also that he wanted certain changes that, from Cornish's perspective, would establish terms that were materially different than those set forth in the governing SFA. *Id.* Cornish stated that he had a draft of a long-form agreement "on [his] desk" but that it "merely expanded on the [SFA]," and that if Lust and Nalbandian were going to discuss substantive changes to the working relationship, Cornish "wasn't going to invest any more time in it until resolved." *Id.* Lust declares that he "anticipated that the long-form agreement I had discussed with Rob Cornish and Zareh Nalbandian would clarify my attachment rights" by "comport[ing] with the industry standard" that he would "be actively involved as a producer, and that ALE would ensure that I would render services as a producer on the projects I brought to ALE and helped develop." Lust Decl. ¶ 3; Dkt. 110-4 at 3.

After Lust had executed the *Peter Rabbit* COE, Columbia sent ALE LLC and Emanuel a revised draft of the producer agreement. It included a term that "Lust shall (unless another [Animal Logic's] executive is mutually agreed by [Columbia] and [Animal Logic]) render services hereunder on a non-exclusive, 'first priority' basis." Lust Decl., Ex. BBB ¶ 3.2; Dkt. 109-3; Shaeffer Decl., Ex. 19; Dkt. 93-6. No further drafts of the producer agreement were exchanged for at least another year. Morgenthal Dep. at 180:3–7, 181:8–13; Dkt. 93-7 at 31–32. Lust declares that at some time in April 2014 he spoke by telephone with Cornish who "confirmed that my credit on Peter Rabbit would be producer" and stated that "the long-form would clarify [Lust's] attachment and credit rights." Lust Decl. ¶ 7.

On July 31, 2014, Lust sent by email a letter to Nalbandian addressing several issues related to their working relationship. Lust Decl., Ex. EE; Dkt. 110-8 at 19–23. Through this letter and a subsequent meeting, Lust sought to identify a business "model that works for both parties going forward and secure that in a long-form agreement." *Id.* at 20. The letter stated that when they first started discussions about collaboration in the summer of 2012, he "was seeking a true partnership in all it's [sic] meaning." *Id.* He also stated that, after discussing the arrangement during his subsequent trip to Australia "it became clear to me that we were not going to get to a place that I felt was truly comfortable as a partnership," but that he "reflected on this very point and came to the conclusion that I would work for two years and show you what I was capable of with the hope that we would reach a better understanding down the road." *Id.* The letter then identifies ten proposed changes to the terms of their relationship that he would like to see set forth in a long-form agreement that would govern their relationship as it proceeded. *Id.* at 21–22.

Several days later, Lust and Nalbandian met in person to discuss these and related issues. Lust Decl., Ex. FFF; Dkt. 110-10 at 13. On August 18, 2014, Lust sent a follow-up email stating that he wished to move forward on a long-form agreement and resolve other outstanding issues as quickly as possible. *Id.* Nalbandian responded, stating that he had not yet found time to review the agreement, but that it was "on [his] list" and would likely "take some time." *Id.* He also stated that he would inform Cornish of agreed-upon changes to Lust's loan obligations. *Id.*

UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA

**REDACTED CIVIL MINUTES – GENERAL**

| Case No. | LA CV17-00308 JAK (AFMx) | Date | September 18, 2018 |
|---|---|---|---|
| Title | Jason Lust v. Animal Logic Entertainment US, et al. | | |

On September 11, 2014, Cornish sent an email to Emanuel, Lust and others regarding the COEs for two films that were set to move into early production, *Nemesis* and *Claus*. Shaeffer Decl., Ex. 30; Dkt. 91-30 at 4. Cornish proposed one final change to the draft COE for *Nemesis* for Lust to sign and suggested that the current draft COE for *Claus* was ready for Lust to sign. *Id.* On September 13, 2013, one of Emanuel's colleagues responded with an updated version of the *Nemesis* COE and asked that Lust sign it. *Id.* at 3. He stated that they had been communicating with Warner Bros. to get the updated COE for *Claus*. *Id.* Cornish responded that he would execute the *Nemesis* COE, and eagerly awaited the updated *Claus* COE. *Id.* On September 15, 2013, Cornish sent an email to Lust and several others requesting that he execute the *Nemesis* COE and return a signed copy. *Id.* On September 18, 2014, Lust responded and stated that he had sent the document to his attorney, Phil Rosen ("Rosen"), for his review. *Id.* at 2. Lust requested a copy of the *Nemesis* producer agreement with Warner Bros., as Rosen wanted to review it together with the COE. *Id.* On September 17, 2014, Cornish sent Lust "the current version [of the producer agreement] sent to Warner[ Bros.] in mid August." *Id.* On September 22, 2014, Lust confirmed receipt of the agreement and told Cornish that he had shared the document with Rosen and would follow up once he heard back from Rosen. *Id.*

On January 29, 2015, Emanuel sent a letter to Rosen to "follow up on . . . Animal Logic's previous requests that your client Jason Lust execute and return a certificate of employment in connection with the film project entitled *Nemesis*," which had been forwarded "to Mr. Lust in September 2014 with a request that he execute and return it." Shaeffer Decl., Ex. 31; Dkt. 91-31. The letter states that "the signed certificate was never delivered to our client, and Animal Logic has now received a request from Warner Bros. Pictures to secure and deliver Mr. Lust's signed certificate." *Id.* The letter also states that counsel had "received from Warner Bros Pictures the execution copy of the certificate of employment for Mr. Lust in connection with the film project *Claus: The Legend Begins*, with a similar request to secure and deliver Mr. Lust's signed certificate." *Id.*

The two-year term of the SFA concluded on January 31, 2015. During that time period, and through the time when the Motion was filed, all compensation owed to Lust under the SFA was paid by ALE LLC. Dkt. 109-2 at 8-9, 24-27.

      D.     After SFA Term: February 2015 to Present

[REDACTED]

On February 4, 2015, Bryan J. Freedman, litigation counsel for Lust, sent a response to Sunny Brenner, one of Emanuel's co-counsel at Loeb & Loeb, confirming receipt of the January 29 letter and stating that Lust was "presently reviewing" and would "provid[e] a response in due course." Lust Decl., Ex. P; Dkt. 110-5 at 5. He stated that the response "will be greatly facilitated if the agreements between Warner Brothers and Animal Logic, LLC are provided" because the COEs "are directly related to the underlying production agreements with Warner Brothers." *Id.* Rosen stated that Lust "has never seen the finalized versions of agreements, and requires reference to them in order to develop a full and informed understanding regarding the certificates of engagement." *Id.* It also stated that the reason for concern was that the terms of the *Peter Rabbit* producer agreement were changed after Lust signed the

UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA

**REDACTED CIVIL MINUTES – GENERAL**

| Case No. | LA CV17-00308 JAK (AFMx) | Date | September 18, 2018 |
|---|---|---|---|
| Title | Jason Lust v. Animal Logic Entertainment US, et al. | | |

*Peter Rabbit* COE. *Id.* As of June 2018, Lust had not executed the COE for *Nemesis* or *Claus*.



In May 2016, ALE LLC sent Lust a copy of the final *Peter Rabbit* producer agreement that included these changes. It also requested that he sign it. Lust stated that he would not sign the agreement unless it was amended to guarantee him a Producer's Credit and to ensure he was an active Producer on the project. Shaeffer Decl., Ex. 25; Dkt. 91-25 at 3. Columbia decided to proceed without Lust's signature.

*Peter Rabbit* was released in theaters in the spring of 2018.

UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA

**REDACTED CIVIL MINUTES – GENERAL**

| Case No. | LA CV17-00308 JAK (AFMx) | Date | September 18, 2018 |
|---|---|---|---|
| Title | Jason Lust v. Animal Logic Entertainment US, et al. | | |

**III.    Analysis**

    A.    Legal Standards

A motion for summary judgment will be granted where "there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). The party seeking summary judgment bears the initial burden to show the basis for its motion and to identify those portions of the pleadings and discovery responses that demonstrate the absence of a genuine issue of material fact. *See Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986). Where the moving party will have the burden of proof on an issue at trial, the movant must affirmatively demonstrate that no reasonable trier of fact could find other than for the moving party. Where the nonmoving party will have the burden of proof on an issue, however, the movant need only demonstrate that there is an absence of evidence to support the claims of the nonmoving party. *See id.* If the moving party meets its initial burden, the nonmoving party must set forth "specific facts showing that there is a genuine issue for trial." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 250 (1986); Fed. R. Civ. P. 56(e).

Only admissible evidence may be considered in connection with a motion for summary judgment. Fed. R. Civ. P. 56(e). However, in considering such a motion, a court is not to make any credibility determinations or weigh conflicting evidence. All inferences are to be drawn in the light most favorable to the nonmoving party. *See T.W. Elec. Serv., Inc. v. Pac. Elec. Contractors Ass'n*, 809 F.2d 626, 630–31 (9th Cir. 1987). However, conclusory, speculative testimony in declarations or other evidentiary materials is insufficient to raise genuine issues of fact and defeat summary judgment. *See Thornhill Publ'g Co. v. GTE Corp.*, 594 F.2d 730, 738 (9th Cir. 1979).

    B.    Application

        1.    Whether the SFA Is an Integrated Agreement

            a)    Legal Standards

"An integrated agreement is a writing or writings constituting a final expression of one or more terms of an agreement." *Alling v. Universal Mfg. Corp.*, 5 Cal. App. 4th 1412, 1433 (1992) (quoting Rest. 2d Contracts, § 209, subd. (1)). The terms set forth in such a writing or writings "may not be contradicted by evidence of a prior agreement or of a contemporaneous oral agreement." Cal. Civ. Proc. Code § 1856(a). However, the terms of the agreement "may be explained or supplemented by evidence of consistent additional terms unless the writing is intended also as a complete and exclusive statement of the terms of the agreement." *Id.* § 1856(b). Further, the terms of the written agreement "may be explained or supplemented by . . . usage of trade." *Id.* § 1856(c). When parties have not "agreed that a written instrument is the exclusive and final embodiment of their contract . . . then the writing is unintegrated, and extrinsic or parol evidence will ordinarily be admitted in aid of establishing the *complete* agreement." *Brawthen v. H&R Block, Inc.*, 28 Cal. App. 3d 131, 137 (1972).

"The determination of whether the agreement in question is an 'integration'—that is, whether it was intended by the parties as a final, complete and exclusive statement of their agreement with respect to the terms included in the agreement—is a question of law to be determined by the court." *Alling*, 5 Cal. App. 4th at 1434 (citing Cal. Civ. Proc. Code § 1856(d)). This determination requires the consideration

UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA

**REDACTED CIVIL MINUTES – GENERAL**

| Case No. | LA CV17-00308 JAK (AFMx) | Date | September 18, 2018 |
|---|---|---|---|
| Title | Jason Lust v. Animal Logic Entertainment US, et al. | | |

of "(1) whether the written agreement appears to state a complete agreement; (2) whether the alleged oral agreement directly contradicts the writing; (3) whether the oral agreement might naturally be made as a separate agreement; [and] (4) whether the jury might be misled by the introduction of the parol testimony." *Id.* However, "[t]he crucial issue in determining whether there has been an integration is whether the parties intended their writing to serve as the exclusive embodiment of their agreement. The instrument itself may help to resolve that issue." *Masterson v. Sine*, 68 Cal. 2d 222, 225 (1968). If present in the written agreement, a merger or integration clause is often "conclusive" of this question. *Grey v. Am. Mgmt. Servs.*, 204 Cal. App. 4th 803, 807 (2012) (citation omitted).

   b)  Application

The SFA does not have a merger or integration clause. *See* Shaeffer Decl., Ex. 1; Dkt. 91-1 at 2. However, it expressly states that the "terms and structure" in the SFA "[f]ollow[ ] our discussions in the last two weeks." *Id.* The SFA also states that it "will form the basis of any longform contractual relationship executed between us." *Id.* Thus, the SFA identifies prior discussions between the contracting parties as the basis of this written agreement and a possible, future, superseding long-form agreement. These factors suggest that the SFA was not intended as a "final, complete and exclusive statement of their agreement" by Lust and Nalbandian. *Alling*, 5 Cal. App. 4th at 1434. On the other hand, the SFA sets forth the length of the collaboration between Lust and ALE LLC, the means and amount of compensation, the nature of services provided and other material terms. Moreover, when a written agreement "provides for the execution of a long form agreement at some unspecified point in the future, that does not render the [writing] a non-integrated contract." *4Kids Entm't, Inc. v. Upper Deck Co.*, 797 F.Supp.2d 236, 246 (S.D.N.Y. 2011).

In light of these considerations, there is not a clear answer to the question whether the SFA is an integrated agreement. However, the answer is not material with respect to the Motion because Lust has not identified any additional terms that were excluded from the SFA but material to the collaborative agreement with Nalbandian. Thus, he does not identify any prior or contemporaneous written or oral agreements that are not set forth in the SFA. Lust argues that evidence regarding his understanding of the term "attachment" and the terms regarding assignment of copyright interests is admissible. These contentions are not material to the whether the SFA is integrated, and if not, what additional terms constitute the binding agreement between the parties.

   2.  <u>Terms of the SFA</u>

   a)  Legal Standards

"Where the meaning of the words used in a contract is disputed, the trial court must provisionally receive any proffered extrinsic evidence which is relevant to show whether the contract is reasonably susceptible of a particular meaning." *Morey v. Vannucci*, 64 Cal. App. 4th 904, 912 (citing *Pac. Gas & Elec. Co. v. Zuckerman*, 189 Cal. App. 3d 1113, 1140-41 (1987); *Pac. Gas & Elec. Co. v. G.W. Thomas Drayage & Rigging Co.*, 69 Cal. 2d 33, 39–40 (1968)). "Indeed, it is reversible error for a trial court to refuse to consider such extrinsic evidence on the basis of the trial court's own conclusion that the language of the contract appears to be clear and unambiguous on its face. Even if a contract appears unambiguous on its face, a latent ambiguity may be exposed by extrinsic evidence which reveals more than one possible meaning to which the language of the contract is yet reasonably susceptible." *Wolf v.*

UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA

**REDACTED CIVIL MINUTES – GENERAL**

| Case No. | LA CV17-00308 JAK (AFMx) | Date | September 18, 2018 |
|---|---|---|---|
| Title | Jason Lust v. Animal Logic Entertainment US, et al. | | |

*Superior Court*, 114 Cal. App. 4th 1343, 1351 (2004). The "determination of whether an ambiguity exists is a question of law." *Id.* The "resolution of an ambiguity is also a question of law," as long as no parol evidence is admitted or, if parol evidence is admitted, there is no conflict within such evidence. *Id.* When there is a conflict in parol evidence supporting "two equally plausible interpretations of the language of a contract," there is a "question of fact which precludes summary judgment." *Id.* (quoting *Walter E. Heller W., Inc. v. Tecrim Corp.,* 196 Cal. App. 3d 149, 158 (1987)).

b)     Application

i.     *Assignment of Intellectual Property to ALE LLC*

The SFA states that Lust's "services related to film, television, interactive, games, and other entertainment related media IP projects will be exclusive for the Term [of the agreement]" and that "Copyright and all related IP in the services [are] to be assigned to [ALE LLC]." Shaeffer Decl., Ex. 1; Dkt. 91-1 at 2–3. The SFA "carve[s] out" certain "previously contracted project attachments" from the assignment requirement. *Id.*

█████████████████████████████████████████████████████ He contends that when they are read together with the statement in the SFA that it "will form the basis of any longform contractual relationship executed between" Lust and ALE LLC, *see* Dkt. 91-1, they support an implied condition that a long-form agreement was to be executed before Lust was obligated to assign any of his intellectual property rights. ████

███████████████████████████████████████████████████████████████████████
███████████████████████████████████████████████

Almost all of the evidence cited in support of these arguments is irrelevant to the construction of the assignment term. The only relevant evidence is included in the initial expert report of Jere Hausfater ("Hausfater"). Funnell Decl., Ex. M, Sub-Ex. A; Dkt. 110-23. Hausfater is a former executive in the motion picture industry with more than 40 years of experience in that field. *Id.* ¶¶ 4, 7; at 6, 7. Hausfater opines that "[t]he copyright terms of the SFA are incomplete," and that "[o]rdinarily, assignment of copyright would be done in a long form agreement in much more detail." *Id.* ¶ 37; at 18. "Based on the information" available to Hausfater, he opines that "under industry standard, the SFA's phrase 'to be assigned,' means that the copyright would be assigned in the future after a long form agreement clarifying all terms was executed." *Id.*

Assuming without deciding that Hausfater's opinions are complete and correct, such evidence may be

---

3 █████████████████████████████████████████████████████████████████████████████
██████████████████ Specifically, the SFA states that it has a two-year term, but that the arrangement is "at will" and that each party may terminate it by providing a four-month advance notice. Shaeffer Decl., Ex. 1; Dkt. 91-1 at 2. The SFA refers to the arrangement between Lust and ALE LLC as a partnership, employer-employee relationship and independent contractor relationship. *Id.* Lust does not explain how these issues are material to the interpretation of the copyright assignment term. Nor does he argue that these terms precluded a meeting of the minds as to an enforceable SFA. Rather, he testified that he knowingly and voluntarily signed the SFA because he "wanted to do the deal." Lust Dep. 55:24–56:11, 58:12–20; Dkt. 91-3 at 17–18, 19.

UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA

**REDACTED CIVIL MINUTES – GENERAL**

| Case No. | LA CV17-00308 JAK (AFMx) | Date | September 18, 2018 |
|---|---|---|---|
| Title | Jason Lust v. Animal Logic Entertainment US, et al. | | |

sufficient to show that the SFA is "reasonably susceptible" to an interpretation imposing the proposed implied condition. *Wolf*, 114 Cal. App. 4th at 1351. However, "[c]onditions precedent are disfavored and will not be read into a contract unless required by plain, unambiguous language." *Effects Assoc's v. Cohen*, 908 F.2d 555, 559 n.7 (9th Cir. 1990). "[I]t is the general rule in contract interpretation that stipulations in an agreement are not to be construed as conditions precedent unless such construction is required by clear, unambiguous language; and particularly so where a forfeiture would be involved or inequitable consequences would result." *Alpha Beta Food Mkts. v. Retail Clerks*, 45 Cal. 2d 764, 771 (1945). "It is not enough to say that without the proposed implied covenant, the contract would be improvident or unwise or would operate unjustly. Parties have the right to make such agreements. The law refuses to read into contracts anything by way of implication except upon grounds of obvious necessity." *Walnut Creek Pipe Distribs. v. Gates Rubber Co. Sales Div.*, 228 Cal. App. 2d 810, 815 (1964).

Applying these standards, in the absence of any language in the SFA suggesting certain duties are conditioned on the future execution of a possible, future long-form agreement and any "obvious necessity" for the imposition of such a condition, the SFA should not be interpreted to include such a condition. The SFA contemplates a possible long-form agreement but does not require that such an agreement be entered before the SFA becomes binding. There is no dispute of material fact that precludes this determination as a matter of law.

### ii.      Attachment to Certain Projects

Under the heading "Attachments," the SFA states that Lust is "entitled to be attached to" certain projects if his "contract with ALE is terminated for any reason or is not renewed after the initial term." Shaeffer Decl., Ex. 1; Dkt. 91-1 at 4. These projects include "pre-existing ALE projects[ ] green lit for production within a two(2) year period from the date of termination," and "[a]ll other projects agreed as commencing development after [February 1, 2013], greenlit for production within a five(5) year period from the date of termination." *Id.* at 3. Under the heading "Credits," the SFA states that Lust is entitled to a credit of "'Producer' or 'Executive Producer,' subject to considerations such as qualification for Australian Producer Offset rebates, your level of involvement in developing existing ALE projects vs new ones, and approval of financiers and distributors (if required)." *Id.* With respect to the "[pre-existing ALE projects] greenlit after [February 1, 2013] to which you are entitled to be attached, [ALE LLC] will use best efforts to provide that you shall receive a credit no less than 'Executive Producer.'" *Id.* As to all other projects "greenlit after [February 1, 2013] to which you are entitled to be attached, you shall be accorded a credit no less than 'Executive Producer.'" *Id.*

The parties dispute the meaning of the term "attach" in the SFA. This term is ambiguous, and no definition is apparent from the text or context of the SFA. Nalbandian and ALE LLC argue that it is undisputed that the "attachment" provisions refer to a "Pay or Play" arrangement, not a "Pay and Play" arrangement, which would provide "a right to both be paid and to perform services [ ] with respect to any greenlit project." Dkt. 109-2 ¶ 22 at 31–32.[4] They argue that Lust, his expert and his counsel each testified to this effect. Lust testified that the term "attachment" in the SFA means a "person has to be used" on a movie, "[u]nless they're pay or played off the movie." Lust Dep. at 336:7–18; 91-3 at 108.

---

[4] This is an important distinction, because it is undisputed that Lust has received all payments from Nalbandian and ALE LLC that were owed to him under the SFA.

UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA

**REDACTED CIVIL MINUTES – GENERAL**

| Case No. | LA CV17-00308 JAK (AFMx) | Date | September 18, 2018 |
|----------|--------------------------|------|--------------------|
| Title | Jason Lust v. Animal Logic Entertainment US, et al. | | |

Plaintiff's expert, Hausfater, testified that a "pay-and-play contract" provides "guaranteed financial renumeration" and a "guarantee[ ] to actually perform those services." Deposition of Jere Hausfater ("Hausfater Dep.") at 22:15-20; Dkt. 91-28. He testified that he was never been "privy to a pay-and-play contract," and that they "are very rare in Hollywood." *Id.* at 22:23–23:3. He testified that Lust can "be attached to *Peter Rabbit* even though the [SFA] has a pay-or-play provision in it." *Id.* at 114:1–4. Rosen testified that the SFA "provides that [Lust] would be attached as a producer to the project, and that what -- being attached to the producer to the project means that he would be attached on a pay or play basis at the discretion of the studio." Deposition of Phillip Rosen ("Rosen Dep.") at 140:24–141:5; Dkt. 91-33 at 29.

Lust does not directly contradict this evidence. Thus, he does not provide any evidence showing that the SFA provided him with "Pay and Play" rights. Rather, he declares that when he signed the SFA, he "anticipated that the long-form agreement I had discussed with Rob Cornish and Zareh Nalbandian would clarify my attachment rights," and that it would "comport with the industry standard for attachment rights when a producer identifies, develops, and pitches a project" by having him "actively involved as a producer" and requiring "ALE [to] ensure that [he] would render services as a producer on the projects [he] brought to ALE and helped develop, as well as on ALE's pre-existing projects." Lust Decl. ¶ 3; Dkt. 110-4. at 3. He also declares that he believes his "'attachment' rights would not allow ALE to take me off any projects, cut me out of correspondence, or prevent me from being involved." *Id.*

Plaintiff's expert opined that "Lust is entitled, pursuant to the Producer's Agreement – Loanout to be attached on a 'pay or play' basis for *Peter Rabbit*, with a decision about his attachment made by the studio, not by ALE," and that "[o]nce a project was set up with a third party, like the Sony *Peter Rabbit* deal, Mr. Lust would be attached for the life of the project. (i.e., the post-termination five-year limit for attachment stated in the SFA would not apply)." Funnell Decl., Ex. M, Sub-Ex. A ¶ 8; Dkt. 110-23 at 10–11. Hausfater further opined that "[t]he term 'attachment,' as used in the movie industry, is that when a producer is attached to a movie, that producer will be the creative force leading the production of the movie," by "[i]nteract[ing] with all talent, cast and crew, above the line and below the line, and be[ing] involved in all facts of the making of the movie, including, without limitation, having a meaning [sic] voice in distribution strategy." *Id.* ¶ 9. He further opined that "[t]he producer attached to the movie will also be involved in the marketing and promotion of the movie." *Id.* ¶ 11. He added that "attachment" is "active work as a producer on a film," and it is "well-known in the film community" that such a role has "tremendous career benefits." *Id.* ¶ 12.

Plaintiff also cites several emails to support his position. Lust sent one of them, which is dated March 4, 2013, to Nalbandian and Cornish; it included his signed copy of the SFA. Funnell Decl., Ex. K; Dkt. 110-21. In this email, Lust stated that he is "signing this version of the proposal" in "good faith," but that he hopes Nalbandian and Cornish "agree to modify it further per your and my last phone conversation (prior to you sending over the signed agreement)." *Id.* at 3. He stated that it was his "understanding that we would be guaranteeing me Executive Producer credit on all new projects after commencement of the contract and that it would be at [ALE LLC's] discretion on the existing/old projects with best faith efforts." *Id.* He also stated that he did not understand the meaning of the terms "to which you are entitled to be attached" in the SFA, because he believes it "could negate all projects because it's ambiguous and undefined." *Id.* Lust then stated that he is "simply trying to get the language that I am comfortable with and reflects what I believe is our understanding," but he "signed the proposal because I am tired of the back and forth and want to move forward with what we are setting out to do here as

UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA

**REDACTED CIVIL MINUTES – GENERAL**

| | | | |
|---|---|---|---|
| Case No. | LA CV17-00308 JAK (AFMx) | Date | September 18, 2018 |
| Title | Jason Lust v. Animal Logic Entertainment US, et al. | | |

there is a lot of work to accomplish." *Id.* Lust asks them "to change this aspect of the proposal as [he does] feel it was what we discussed." *Id.*

Cornish sent a prompt reply. *Id.* at 2. In his message, Cornish thanked Lust for "signing and returning the agreement" and added that "[f]rom the outset we have stated that, given that credits are subject to input from multiple sources, we are not in a position to guarantee" certain credits, hence the "best efforts" terms. *Id.* Cornish also stated that "'to which you are entitled to be attached' is clearly defined in the Agreement under 'Attachments' ie the 2yr / 5 yr sunset clauses." *Id.* He stated that he "[t]rust[s] this clarifies and confirms" the issues raised in Lust's email, and he told Lust to let him know "if you want to discuss further." *Id.* The same day, Cornish sent an email to a colleague working for the AL Parties in which he forwarded "the signed copy of the agreed terms for Jason Lust which will eventually get rolled up in a formal agreement." Funnell Decl., Ex. L; Dkt. 110-22 at 2.

There is no conflict as to the parol evidence. Therefore, the ambiguity can be resolved as a matter of law. Lust declares that at the time he executed the SFA he believed that a long-form agreement would later be executed that would "clarify" his attachment rights and "comport with the industry standard for attachment rights" by ensuring he would actively work on certain projects. Lust Decl. ¶ 3; Dkt. 110-4 at 3. This statement suggests Lust did not believe that the SFA as drafted provided him with the right to work actively on all such projects. Although Lust's expert opines that the term "attachment" commonly means a right to provide active, producing services, he also testified that "pay and play" contracts are "very rare" in Hollywood. Further, Lust and his attorney each testified that the SFA was a "pay or play" arrangement.

For these reasons, the SFA requires that Lust either be paid, consistent with its terms, for each project to which he is "entitled to be attached," or be permitted to provide active producing services on each project. As noted, there is no genuine dispute of material fact arising from a conflict in parol evidence that precludes this determination as a matter of law.

      3.    <u>FAC</u>

          a)    Breach of Contract

              (1)    <u>Legal Standards</u>

"The elements for a breach of contract action under California law are: (1) the existence of a contract, (2) plaintiff's performance or excuse for nonperformance, (3) defendant's breach, and (4) damages to plaintiff as a result of the breach." *Buschman v. Anesthesia Bus. Consultants LLC*, 42 F. Supp. 3d 1244, 1250 (N.D. Cal. 2014); *see also Alcalde v. NAC Real Estate Invs. & Assignments, Inc.*, 316 Fed. App'x 661, 662 (9th Cir. 2009).

              (2)    <u>Application</u>

The FAC alleges that Nalbandian and ALE LLC breached the "Attachments" term in the SFA "by not allowing Lust to be attached as defined in Paragraph 59(b) and [by] taking actions to prevent Lust from being attached to the projects." FAC ¶ 70; Dkt. 19 at 20. Paragraph 59 of the FAC does not have a subsection (b), nor does it discuss the term "attachment." *See id.* ¶ 59. The FAC does offer a proposed

UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA

**REDACTED CIVIL MINUTES – GENERAL**

| | | | |
|---|---|---|---|
| Case No. | LA CV17-00308 JAK (AFMx) | Date | September 18, 2018 |
| Title | Jason Lust v. Animal Logic Entertainment US, et al. | | |

definition of "attachment." It "means that the person is involved substantively in developing the project and will be hired to perform services in connection with the film once the production begins." *Id.* ¶ 11 n.1. However, as noted above, the SFA did not require that Lust be permitted to provide active producer services on every project. Rather, the SFA is a "pay or play" arrangement, under which Lust was guaranteed either an opportunity to provide such services or receive certain financial compensation.

It is undisputed that Lust has received all payments owed to him under the SFA. Construing all of the evidence in the light most favorable to Lust, there is no genuine dispute of material fact as to whether Nalbandian and ALE LLC materially performed their obligations to "attach" Lust to projects under the SFA. The same conclusion is warranted as to the related claim that Nalbandian and ALE LLC breached the SFA by taking actions to deprive Lust from being attached to projects. However, whether they took actions to prevent Lust from providing active producing services on certain projects may be relevant to the breach of implied covenant of good faith and fair dealing claim, which is discussed below.

For these reasons, the Motion is **GRANTED** as to Lust's claim for breach of contract.

> b) Breach of Implied Covenant of Good Faith and Fair Dealing

>> (1) Legal Standards

The elements of a breach of implied covenant of good faith and fair dealing action under California law are: "(1) the parties entered into a contract; (2) the plaintiff fulfilled his obligations under the contract; (3) any conditions precedent to the defendant's performance occurred; (4) the defendant unfairly interfered with the plaintiff's rights to receive the benefits of the contract; and (5) the plaintiff was harmed by the defendant's conduct." *Rosenfeld v. JPMorgan Chase Bank, N.A.*, 732 F. Supp. 2d 952, 968 (N.D. Cal. 2010).

"Every contract imposes upon each party a duty of good faith and fair dealing in its performance and its enforcement." *Carma Developers, Inc. v. Marathon Dev. Cal., Inc.*, 2 Cal. 4th 342, 371 (1992). "[T]he covenant is implied as a supplement to the express contractual covenants, to prevent a contracting party from engaging in conduct that frustrates the other party's rights to the benefits of the agreement." *Waller v. Truck Ins. Exch., Inc.*, 11 Cal. 4th 1, 36 (1995). The covenant requires "that neither party will do anything which will injure the right of the other to receive the benefits of the agreement." *Andrews v. Mobile Aire Estates*, 125 Cal. App. 4th 578, 589 (2005). "The covenant . . . cannot be endowed with an existence independent of its contractual underpinnings. It cannot impose substantive duties or limits on the contracting parties beyond those incorporated in the specific terms of their agreement." *Guz v. Bechtel Nat'l Inc.*, 24 Cal. 4th 317, 349–50 (2000). Thus, the covenant "is limited to assuring compliance with the express terms of the contract, and cannot be extended to create obligations not contemplated in the contract." *Racine & Laramie, Ltd. v. Dep't of Parks & Recreation*, 11 Cal. App. 4th 1026, 1032 (1992). However, "breach of a specific provision of the contract is not a necessary prerequisite to a claim for breach of implied covenant of good faith and fair dealing." *Schwartz v. State Farm Fire & Cas. Co.*, 88 Cal. App. 4th 1329, 1339 (2001). "Were it otherwise, the covenant would have no practical meaning, for any breach thereof would necessarily involve breach of some other term of the contract." *Carma Developers, Inc.*, 2 Cal. 4th at 373. "The covenant of good faith finds particular application in situations where one party is invested with a discretionary power affecting the

UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA

**REDACTED CIVIL MINUTES – GENERAL**

| | | | |
|---|---|---|---|
| Case No. | LA CV17-00308 JAK (AFMx) | Date | September 18, 2018 |
| Title | Jason Lust v. Animal Logic Entertainment US, et al. | | |

rights of another. Such power must be exercised in good faith." *Id.* at 372. Accordingly, a plaintiff may bring an implied covenant claim where the defendant acted in bad faith to frustrate bargained-for contractual benefits. *See Guz*, 24 Cal. 4th at 353 n.18 (acknowledging that "the covenant might be violated if termination of an at-will employee was a mere pretext to cheat the worker out of another contract benefit to which the employee was clearly entitled, such as compensation already earned").

(2)    Application

The FAC alleges that Nalbandian and ALE LLC breached the implied covenant of good faith and fair dealing arising from the SFA "by not protecting Lust's producer role and, instead, actively taking steps to ensure that Lust is not attached to projects in accordance with the Attachment term of the SFA." FAC ¶ 74. It is further alleged that their "wrongful conduct carved Lust out of the . . . development [of certain films], frustrated Lust's efforts to develop the [f]ilms, and therefore deprived Lust of the benefits of the SFA." *Id.* ¶ 75. Because the SFA was not a "pay and play" arrangement, Lust did not have an express right to provide producing services on all projects. However, it is clear that, at the time that the SFA was executed and for a significant period thereafter, it was generally understood and anticipated that Lust might actively produce some of the projects that he and Nalbandian were pursuing. This shows that it was not the mutual expectation or understanding of these parties for much of their relationship that Lust would, as a matter of course, be confined to the "pay" component of his "pay or play" arrangement.

There are disputed facts as to the involvement of Nalbandian and ALE LLC in the application process for the Screen Australia Producer Offset. These include what actions Nalbandian and his colleagues took to encourage or discourage the inclusion of Lust on the application.

There is also evidence that Nalbandian, other ALE LLC colleagues and their counsel had communications with Columbia regarding Lust's involvement in *Peter Rabbit* without Lust's knowledge. This includes a March 2014 request by Emanuel to change the *Peter Rabbit* producer agreement in a manner that would make it easier to exclude Lust from an active role in the film and to reduce his credit. Although such an action may not have been a breach of any express terms in the SFA, it may have constituted a breach of its implied covenant of good faith and fair dealing. There is no evidence that Lust was aware of these proposed changes to the producer agreement at the time he executed the *Peter Rabbit* COE and assigned his rights in the film.

This evidence is sufficient to raise a genuine dispute as to whether Nalbandian and ALE LLC "[acted] in bad faith to frustrate the . . . *actual* benefits" in the SFA. *See Guz*, 24 Cal. 4th at 353 n.18. This conclusion is bolstered by the roles of the parties, in which Nalbandian and ALE LLC were "invested with a discretionary power affecting the rights of" Lust, through their relationship and direct communications with Columbia. *Carma*, 2 Cal. 4th at 372.

For these reasons, the Motion is **DENIED** as to Lust's claim for breach of the covenant of good faith

UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA

**REDACTED CIVIL MINUTES – GENERAL**

| Case No. | LA CV17-00308 JAK (AFMx) | Date | September 18, 2018 |
|---|---|---|---|
| Title | Jason Lust v. Animal Logic Entertainment US, et al. | | |

and fair dealing.

        c)     Breach of Fiduciary Duty

        (1)     <u>Legal Standards</u>

"A fiduciary relationship is a special circumstance in which the fiduciary 'assumes duties beyond those of mere fairness and honesty' and 'must undertake to act on behalf of the beneficiary, giving priority to the best interest of the beneficiary.'" *World Surveillance Grp., Inc. v. La Jolla Cove Invs., Inc.*, 66 F. Supp. 3d 1233, 1235 (N.D. Cal. 2014) (quoting *Comm. on Children's Television, Inc. v. Gen. Foods Corp.,* 35 Cal. 3d 197, 222 (1983)). "A fiduciary's power to transact business with his beneficiary is severely limited; he must use the utmost good faith and, if he profits from the transaction, the law presumes the agreement was entered into by the beneficiary without sufficient consideration and under undue influence." *La Jolla Cove*, 66 F. Supp. 3d at 1235. For a fiduciary duty to exist, a person "must either knowingly undertake to act on behalf and for the benefit of another, or must enter into a relationship which imposes that undertaking as a matter of law." *City of Hope Nat'l Med. Ctr. v. Genentech, Inc.*, 43 Cal. 4th 375, 386 (2008). "Examples of such relationships are a joint venture, a partnership, or an agency." *Id.* While fiduciary duties are ordinarily "not impose[d] . . . on commercial parties in arms' length relationships," such duties may be imposed "in special situations, such as when unusual circumstances give rise to an unusual level of trust or vulnerability." *Kabushiki Kaisha Megahouse v. Anjar Co. LLC*, No. 14-CV-598-CAS(CWx), 2014 WL 5456523, at \*10 (C.D. Cal. Oct. 20, 2014).

"The elements of a cause of action for breach of fiduciary duty are: (1) the existence of a fiduciary duty; (2) breach of the fiduciary duty; and (3) damage proximately caused by the breach." *Gutierrez v. Girardi*, 194 Cal. App. 4th 925, 932 (2011) (internal quotation and citation omitted). "Whether a fiduciary duty exists is generally a question of law. Whether the defendant breached that duty towards the plaintiff is a question of fact." *Marzec v. Pub. Emps.' Ret. Sys.*, 236 Cal. App. 4th 889, 915 (2015) (emphasis and internal citations omitted).

        (2)     <u>Application</u>

Lust argues that Nalbandian and ALE LLC owed him a fiduciary duty, which they breached by, inter alia, depriving him of the opportunity to be attached to certain projects, not protecting his financial interests in such projects, usurping opportunities at his expense, and convincing him to convey his intellectual property rights without first disclosing all material facts. *See* FAC ¶ 84. The primary dispute is whether Nalbandian and ALE LLC owed any fiduciary duty to Lust. Lust argues that they entered into a partnership that imposed such duties or, if no legally cognizable partnership was formed, they "created a relationship . . . based on trust and confidence" that gave rise to a fiduciary duty. Dkt. 110 at 23–28.[5]

"An essential element of a partnership . . . is the right of joint participation in the management and control of the business." *Bank of Calif. v. Connelly*, 35 Cal. App. 3d 350, 364 (1973). There is evidence

---

[5] Lust does not argue that Nalbandian and ALE LLC "knowingly undert[ook] to act on behalf and for the benefit" of him. *City of Hope*, 43 Cal. 4th at 386.

UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA

**REDACTED CIVIL MINUTES – GENERAL**

| Case No. | LA CV17-00308 JAK (AFMx) | Date | September 18, 2018 |
|---|---|---|---|
| Title | Jason Lust v. Animal Logic Entertainment US, et al. | | |

that Nalbandian and AL Parties were providing "all of the capital and all other expenses for the" film ventures, they "alone were to share in any losses," and the projects to be pursued were at their ultimate discretion. *Bank of Calif.*, 35 Cal. App. 3d at 365; *Zorich v. Petroff*, 152 Cal. App. 2d 806, 810 (1957).

Lust does not argue that he had a joint right to manage and control the business with Nalbandian. Instead, he argues that they repeatedly referred to each other as "partners" and their relationship as a "partnership." Dkt. 110 at 23–28. There is evidence that Nalbandian and Lust each used the terms "partner" and "partnership" in their communications with one another and others. *See, e.g.*, Funnell Decl., Ex. O; ████████████████ Dkt. 110-25, ████████████ However, the use of these terms does not, without more, give rise to a legally cognizable partnership. *Watts v. Holland*, 153 F.2d 337, 339 (9th Cir. 1946); *Love v. The Mail on Sunday*, 489 F. Supp. 2d 1100, 1107–08 (C.D. Cal. 2007); *see MP Nexlevel of Cal., Inc. v. CVIN*, No. 1:14-CV-288-LJO-GSAx, 2014 WL 5019639, at *8 (E.D. Cal. Oct. 7, 2014). When these terms are used "in the colloquial sense indicating cooperation," they "do not support the existence of a legal partnership pursuant to California law." *In re Shoe Pavilion, Inc.*, 2013 WL 12113232, at *3 n.2 (C.D. Cal. May 30, 2013). Nor is the subjective belief of one party as to the existence of partnership sufficient to establish its existence. *Epstein v. Stahl*, 176 Cal. App. 2d 53, 57 (1959) ("The relationship between the parties is not to be determined by the label which the pleader gives to an agreement . . . ."). Any duties imposed through the SFA, or otherwise implied by the nature of their interactions, are consistent with those of "fairness and honesty" which govern all arms-length commercial dealings. *See La Jolla Cove*, 66 F. Supp. 3d at 1235. Accordingly, there is no relevant evidence that a partnership was formed among Lust and Nalbandian and ALE LLC.

████████████████████████████████████████████████████████████████████ The only authority cited in support of this argument is Cal. Corp. Code § 16308(a), which provides:

> If a person, by words or conduct, purports to be a partner . . . in a partnership with one or more persons not partners, the purported partner is liable a person to whom the representation is made, if that person, relying on the representation, enters into a transaction with the actual or purported partnership.

Cal. Corp. Code § 16308(a). This means that a person who has purported to be in a partnership may be estopped from denying the existence of the partnership if he induced a third party to transact with the purported partnership. *Id.* This provision does not apply here, where one purported partner (Lust) is seeking to prevent another (Nalbandian) from denying the existence of their purported partnership. Section 16308(a) applies only to disputes between a purported partner and a third party, not to disputes between purported partners. Further, no court has adopted this interpretation of the statute. *See MP Nexlevel*, 2014 WL 5019639, at *8 (there is no authority "holding that two parties *publicly* describing themselves as 'partners' or describing their relationship as a 'partnership' is sufficient, without more, to establish a legal partnership"). Thus, Nalbandian and ALE LLC are not estopped from challenging the existence of a partnership with Lust.

Finally, Lust argues that the "trust and confidence [he] reposed in the integrity and fidelity of [Nalbandian and ALE LLC]" and in their commitment to "represent and protect his interests when dealing with the studios" gave rise to a fiduciary duty for them to "not obtain an advantage over Lust."

UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA

**REDACTED CIVIL MINUTES – GENERAL**

| Case No. | LA CV17-00308 JAK (AFMx) | Date | September 18, 2018 |
|---|---|---|---|
| Title | Jason Lust v. Animal Logic Entertainment US, et al. | | |

Dkt. 110 at 22–25. However, "fiduciary obligations are not necessarily created when one party entrusts valuable intellectual property to another for commercial development in exchange for the payment of compensation contingent on commercial success." *City of Hope*, 43 Cal. 4th at 391. Moreover, it is well-settled that the "mere receipt of confidential information does not create fiduciary duty." *Id.* at 392. Lust argues that *Chou v. Univ. of Chi.*, 254 F.3d 1347, 1362 (Fed. Cir. 2001), compels the imposition of a fiduciary duty on Nalbandian. This position is not persuasive. *Chou* involved the interpretation of Illinois law, and there was a significant "disparity in age, education, and business experience between the parties" that justified the imposition of fiduciary duty on the older, better educated and more experienced party. *Id.* Lust has a masters degree in the arts and considerable experience in the film industry. *See* Lust Decl. ¶ 2. Indeed, it is Lust's position that it was his experience and knowledge in the film industry that prompted Nalbandian to seek out his services. Therefore, *Chou* does not apply, even if it were deemed an interpretation of California law.

For these reasons, there is no triable issue of material fact as to whether Nalbandian or ALE LLC assumed a fiduciary duty to Lust. Thus, the Motion is **GRANTED** as to Lust's claim for breach of fiduciary duty.

                d)      Fraud

                    (1)     Legal Standards

"To plead a cause of action for fraud, the plaintiff must allege (1) a knowingly false representation by the defendant, (2) an intent to defraud or to induce reliance, (3) justifiable reliance, and (4) resulting damages." *Croeni v. Goldstein*, 21 Cal. App. 4th 754, 758 (1994). If the claim is based on concealment rather than misrepresentation, the necessary elements include that:

      (1) the defendant must have concealed or suppressed a material fact, (2) the defendant must have been under a duty to disclose the fact to the plaintiff, (3) the defendant must have intentionally concealed or suppressed the fact with the intent to defraud the plaintiff, (4) the plaintiff must have been unaware of the fact and would not have acted as he did if he had known of the concealed or suppressed fact, and (5) as a result of the concealment or suppression of the fact, the plaintiff must have sustained damage.

*Hahn v. Mirda*, 147 Cal. App. 4th 740, 748 (2007) (quoting *Mktg. W., Inc. v. Sanyo Fisher (USA) Corp.*, 6 Cal. App. 4th 603, 612–13 (1992)).

                    (2)     Application

Lust contends that Nalbandian and ALE LLC made fraudulent misrepresentations to him, and fraudulently concealed material information from him.

                        (a)     Misrepresentation

                            (i)     Five-Year Partnership and Long-Form Agreement

Lust contends that he entered into the SFA in reliance on representations by Nalbandian that they

UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA

**REDACTED CIVIL MINUTES – GENERAL**

| Case No. | LA CV17-00308 JAK (AFMx) | Date | September 18, 2018 |
|---|---|---|---|
| Title | Jason Lust v. Animal Logic Entertainment US, et al. | | |

would pursue a five-year partnership, and the representation by Nalbandian and Cornish that a long-form agreement would more fully set forth the terms of the partnership. Nalbandian and ALE LLC argue that this claim fails as a matter of law because the SFA expressly stated that it had a two-year term. Dkt. 90 at 34. Under California law, "reliance on representations" conflicting with "the express provisions of the written contract" are "unjustified as a matter of law." *Hadland v. NN Inv'rs Ins. Co.*, 24 Cal. App. 4th 1578, 1589 (1994). In general, parol evidence is not admissible to show a promise "directly at variance with the promise of the writing." *Alling v. Universal Mfg. Corp.*, 5 Cal. App. 4th 1412, 1437 (1992). However, "it was never intended that the parol evidence rule should be used as a shield to prevent the proof of fraud." *Riverisland Cold Storage, Inc. v. Fresno-Madera Prod. Credit Ass'n*, 55 Cal. 4th 1169, 1180–81 (2013) (internal quotation marks omitted).

Under these principles, a showing of fraudulent inducement must be one that "undermines the essential validity of the parties' agreement" and the notion that "the parties freely entered into an agreement reflecting a meeting of the minds." *Riverisland Cold Storage, Inc. v. Fresno-Madera Prod. Credit Ass'n*, 55 Cal. 4th 1169, 1182 (2013). "Fraudulent intent must often be established by circumstantial evidence." *Tenzer v. Superscope, Inc.*, 39 Cal. 3d 18, 30 (1985); *see also Hayes v. Palm Seedlings Partners-A (In re Agric. Research & Tech. Grp., Inc.)*, 916 F.2d 528, 534 (9th Cir. 1990). The presence of such circumstantial evidence raises a question of fact that cannot be resolved on a motion for summary judgment. *See Locke v. Warner Bros., Inc.*, 57 Cal. App. 4th 354, 367–68 (1997). However, "the intent element . . . entails more than proof of an unkept promise or mere failure of performance." *Riverisland*, 55 Cal. 4th at 1183. If there is "no further evidence of fraudulent intent than proof of nonperformance of a[ ] promise, [the claim] will never reach a jury." *Id.*

Lust argues that Nalbandian and ALE LLC actions reflected a "hasty repudiation of their promises, their failure to even attempt performance, and their assurances that they would perform" are circumstantial evidence that they "intended all along to defraud Lust." Dkt. 110 at 31. However, there is no evidence supporting these conclusory statements.



It is undisputed that Nalbandian and ALE LLC made all required payments to Lust throughout the two-year term. It is also undisputed that no one represented to Lust when the SFA was executed in March 2013 that any subsequent long-form agreement would materially alter the terms of the SFA. Dkt. 109-2 ¶ 38.

This evidence, along with the undisputed facts that no long-form agreement was ever executed and that the contractual relationship was never extended beyond the original two-year term, does not create a dispute of material fact as to any actionable misrepresentation by Nalbandian or ALE LLC regarding

UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA

**REDACTED CIVIL MINUTES – GENERAL**

| Case No. | LA CV17-00308 JAK (AFMx) | Date | September 18, 2018 |
|---|---|---|---|
| Title | Jason Lust v. Animal Logic Entertainment US, et al. | | |

the execution of a long-form agreement or the extension of their contractual relationship.

(ii)     Priority Producer

Lust contends that he signed the *Peter Rabbit* COE based on the representations that he would be a
"Priority Producer" for the film. However, Lust was contractually obligated under the SFA to assign his
rights to *Peter Rabbit*. Because "[n]o damage is inflicted on a party which is induced to perform its own
contract," *Cal. & Hawaiian Sugar Co. v. Sun Ship, Inc.*, 794 F.2d 1433, 1439 (9th Cir. 1986), this claim
fails as a matter of law. ████████████████████████████████████████████████████

████████████████████████████████████████████████████████████████████████ This argument lacks merit. Independent of these additional
statements, Lust remained bound by the SFA. One of his obligations under its terms was to assign his
rights in *Peter Rabbit*. Subsequent statements by Nalbandian and his colleagues did not relieve Lust of
this duty. Therefore, Lust did not suffer any harm by signing a document he was contractually obligated
to execute.

*                              *                              *

For these reasons, the Motion is **GRANTED** as to Lust's claims for fraudulent misrepresentation.

(b)     Concealment

Lust argues that Nalbandian and ALE LLC fraudulently concealed their unique definitions of
"attachment" and "advances" and their intent to remove Lust as a Producer on *Peter Rabbit* when they
urged him to execute the *Peter Rabbit* COE. Lust contends that he would not have executed the SFA if
Nalbandian and ALE LLC had not concealed the fact that they defined the term "attachment" differently
than as it was used in the SFA. Nalbandian and ALE LLC argue that this claim is merely a contention
that they did not intend to perform their obligations under the SFA. From this they argue that the claim
is barred by the economic loss doctrine. Dkt. 90 at 34; Dkt. 114 at 18.

In general, the economic loss doctrine bars tort claims that "restate contractual obligations," thereby
limiting parties to contract damages for breaches of those contractual obligations. *Aas v. Superior
Court*, 24 Cal. 4th 627, 643 (2000). The rule is premised on the distinction between the laws of contract
and tort, and the divergent rights, duties, and available remedies that derive from each:

> The rule "prevents the law of contract and the law of tort from dissolving into one another."
> *Robinson Helicopter Co., Inc. v. Dana Corp.*, 34 Cal. 4th 979, 988 (2004) (internal
> modification and quotations omitted). By preventing tort claims--and, thus, tort damages-
> -the rule encourages parties to reach a mutually beneficial private bargain. Limiting
> recovery to contract damages makes it easier for parties to "estimate in advance the
> financial risks of their enterprise." *Freeman & Mills, Inc. v. Belcher Oil Co.*, 11 Cal. 4th 85,
> 106 (1995) (quoting *Applied Equip. Corp. v. Litton Saudi Arabia Ltd.*, 7 Cal. 4th 503, 515
> (1994)); *Foley v. Interactive Data Corp.*, 47 Cal. 3d 654, 694 (1988). As a result, the rule
> is particularly strong when a party alleges "commercial activities that negligently or

UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA

**REDACTED CIVIL MINUTES – GENERAL**

| Case No. | LA CV17-00308 JAK (AFMx) | Date | September 18, 2018 |
|---|---|---|---|
| Title | Jason Lust v. Animal Logic Entertainment US, et al. | | |

inadvertently [went] awry." *Robinson Helicopter*, 34 Cal. 4th at 991 n.7.

*United Guar. Mortg. Indem. Co. v. Countrywide Fin. Corp.*, 660 F. Supp. 2d 1163, 1180 (C.D. Cal. 2009). There are exceptions to the economic loss doctrine. Those exceptions have been defined as follows:

> [A] tortious breach of contract . . . may be found when (1) the breach is accompanied by a traditional common law tort, such as fraud or conversion; (2) the means used to breach the contract are tortious, involving deceit or undue coercion; or (3) one party intentionally breaches the contract intending or knowing that such a breach will cause severe, unmitigable harm in the form of mental anguish, personal hardship, or substantial consequential damages.

*Erlich v. Menezes*, 21 Cal. 4th 543, 553–54 (1999). Further, "[t]ort damages have been permitted in contract cases where . . . the contract was fraudulently induced" because "the duty that gives rise to tort liability is either completely independent of the contract or arises from conduct which is both intentional and intended to harm." *Id.* at 551–552.

Lust has not identified any evidence to support a showing that Nalbandian and ALE LLC had a different definition than Lust used prior to executing the SFA, knew what Lust believed the SFA's use of "attachment" meant, or otherwise intended to induce Lust into executing the contract based on such omitted information. Instead, the only evidence presented to support the claim that ALE LLC and Nalbandian fraudulently induced Lust to signing the SFA by omitting their unique definition of "attachment" is that they later expressed disagreement with Lust as to the meaning of the term. This, without more, is insufficient to demonstrate the requisite intent required for a fraudulent concealment claim.

The same conclusion is warranted as to Lust's argument that Nalbandian and ALE LLC fraudulently concealed their definition of the term "advances" prior to the execution of the SFA. Lust has not provided any evidence that the parties defined the term differently when the SFA was executed that Nalbandian and ALE LLC knew what Lust believed the term meant at that time or that they otherwise intended to induce Lust to executing the SFA based on any such omitted information. Evidence that they later expressed disagreement with Lust as to the meaning of this term does not create a dispute of material fact as to an intent to conceal.[6]

Lust next claims that Nalbandian and ALE LLC fraudulently concealed their intent to remove Lust as a Producer on *Peter Rabbit* when they encouraged him to execute the COE. However, as noted, "[n]o damage is inflicted on a party which is induced to perform its own contract." *Sun Ship, Inc.*, 794 F.2d at 1439. Lust was obligated under the SFA to assign his rights to *Peter Rabbit*, so the consequences of his contractually obligated execution of the COE cannot represent actionable harm.

For these reasons, there is no genuine dispute of material fact as to whether Nalbandian or ALE LLC fraudulently concealed information from Lust. Thus, the Motion is **GRANTED** as to Lust's claims for

---

[6] Lust also did not present evidence of any injury or harm that he suffered as a result of the alleged concealment of the different definition of "advances."

UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA

**REDACTED CIVIL MINUTES – GENERAL**

| Case No. | LA CV17-00308 JAK (AFMx) | Date | September 18, 2018 |
|---|---|---|---|
| Title | Jason Lust v. Animal Logic Entertainment US, et al. | | |

fraudulent concealment.

(c)     Constructive Fraud

The FAC also advances a claim for constructive fraud arising from the alleged breach of ALE LLC and
Nalbandian's fiduciary duties. FAC ¶¶ 110-12; Dkt. 19 at 29. As noted, there is no dispute of material
fact as to whether they owed any fiduciary duties to Lust. In the absence of any such duties, this claim
fails as a matter of law. The Motion is **GRANTED** as to Lust's claim for constructive fraud.

e)     Declaratory Relief

(1)     Legal Standards

"Copyright protection subsists . . . in original works of authorship fixed in any tangible medium of
expression . . . from which they can be perceived, reproduced, or otherwise communicated . . .
includ[ing] . . . literary works . . . [and] motion pictures." 17 U.S.C. § 102(a)(1), (6). "[T]he author is the
party who actually creates the work, that is, the person who translates an idea into a fixed, tangible
expression entitled to copyright protection." *Garcia v. Google, Inc.*, 786 F.3d 733, 744 (9th Cir. 2015)
(quoting *Cmty. for Creative Non-Violence v. Reid*, 490 U.S. 730, 737 (1989)). The "author" is "the
person to whom the work owes its origin and who superintended the whole work." *Aalmuhammed v.
Lee*, 202 F.3d 1227, 1233 (9th Cir. 2000) (quoting *Burrow-Giles Lithographic Co. v. Sarony*, 111 U.S.
53, 61 (1884)). "In a movie this definition, in the absence of a contract to the contrary, would generally
limit authorship to someone at the top of the screen credits, sometimes the producer, sometimes the
director, possibly the star, or the screenwriter - someone who has artistic control." *Aalmuhammed*, 202
F.3d at 1233.

It is well-settled that mere "creative contribution does not suffice to establish authorship of the movie."
*Id.* If authorship were defined as those who made a substantial creative contribution, the "test would not
distinguish . . . [e]veryone from the producer and director to casting director, costumer, hairstylist, and
'best boy,'" each of whom is "listed in the movie credits because all of their creative contributions really
do matter." *Id.* When a party lacks control over the actual creation of the film, *i.e.*, was not the person
who "actually formed the picture by putting the persons in position, and arranging the place," there is
"strong evidence of the absence of co-authorship" of the film and thus the copyright in the film itself. *Id.*
at 1234–35 (quoting *Burrow-Giles*, 111 U.S. at 61).

(2)     Application

Lust seeks declaratory judgment "to determine the Parties' respective intellectual property rights in
*Monkeys*, *Betty Boop*, *The Life and Adventures of Santa Claus*, *Spy v. Spy*, *Astro Boy*, *The 'Animated
Princess Movie*,' *The Shrinking of Treehorn* and *Fortunately the Milk*." FAC ¶ 125. In June 2017, Lust
filed with the Copyright Office producer synopses for *Astro Boy*, *Monkeys*, *The Shrinking of Treehorn*
and *Fortunately the Milk*. *See* ▮▮▮▮▮▮▮▮▮; Lust Dep. at 268:15–269:15, 270:14–20; Dkt. 91-
3, ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮ Lust has not submitted evidence of actual involvement in the
creation of these films. To the contrary, his primary complaint is that he was prevented from taking an
active role in their production. However, authorship in the copyright for a motion picture is limited to the

UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA


**REDACTED CIVIL MINUTES – GENERAL**

| Case No. | LA CV17-00308 JAK (AFMx) | | Date | September 18, 2018 |
|---|---|---|---|---|
| Title | Jason Lust v. Animal Logic Entertainment US, et al. | | | |

person or small number of persons who actively controlled the creation and production of the film. *See Aalmuhammed*, 202 F.3d at 1233. There is no evidence that Lust had any such involvement in these films.

Nalbandian and ALE LLC do not dispute that Lust may have protectable interests in the producer synopses. As the purported author of these writings, Lust may have a copyrightable interest in them as literary works. However, any such interest does not *ipso facto* provide him with cognizable rights in feature films bearing the same titles that were produced, developed, directed, edited and finished by others. Thus, there is no triable issue of material fact as to Lust's claim for declaratory judgment. The Motion is **GRANTED** as to Lust's claim for declaratory relief.

> f)     Accounting

> (1)     Legal Standards

"An accounting cause of action is equitable in nature, and may be sought 'where . . . the accounts are so complicated that an ordinary legal action demanding a fixed sum is impracticable.'" *Meister v. Mensinger*, 230 Cal. App. 4th 381, 403 (2014) (quoting *Civic W. Corp. v. Zila Indus., Inc.*, 66 Cal. App. 3d 1, 14 (1977)). California courts have recognized accounting claims where the defendant has allegedly abused a special relationship with the plaintiff, "such as in cases involving trusts, partnerships and domestic relations, or fiduciary relationships." *Meister*, 230 Cal. App. 4th at 403–04 (citing *Union Bank v. Superior Court*, 31 Cal. App. 4th 573, 593–94 (1995)). However, "a fiduciary relationship between the parties is not required to state a cause of action for accounting. All that is required is that some relationship exists that requires an accounting." *Teselle v. McLoughlin*, 173 Cal. App. 4th 156, 179 (2009). Plaintiff must also demonstrate underlying misconduct on the part of the defendant. *See Prakashpalan*, 223 Cal. App. 4th at 1137; *Union Bank*, 31 Cal. App. 4th at 593–94.

> (2)     Application

The parties dispute whether accounting is a cause of action or a remedy. *See* Dkt. 110 at 33; ███████████████. However, it is undisputed that Lust must demonstrate some underlying misconduct to be entitled to an accounting. *See Prakashpalan*, 223 Cal. App. 4th at 1137 ("Some underlying misconduct on the part of the defendant must be shown to invoke the right to this equitable remedy."). There is a dispute of material fact as to whether Nalbandian and ALE LLC breached the SFA's implied covenant of good faith and fair dealing. It is undisputed that Lust had an ongoing relationship with Nalbandian and ALE LLC for several years. These issues are sufficient to preclude summary judgment. Therefore, the Motion is **DENIED** as to Lust's claim for accounting.

> 4.     First Amended Counterclaim: Breach of Contract

The AL Parties contend that Lust breached the SFA by refusing to assign his intellectual property rights in two films, *Nemesis* and *Claus*. They contend that this breach occurred after they and Warner Bros. Studios, who was controlling the films, requested that he do so. Lust previously executed the COE for *Peter Rabbit*, but he did not sign the COEs for these films. *See* Lust Dep. at 260:4–8; Rosen Dep. at 78:3–82:10; Shaeffer Decl., Ex. 31; Dkt. 91-3 at 89, 91-31, 91-33 at 10–14, 109-6.

UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA

**REDACTED CIVIL MINUTES – GENERAL**

| Case No. | LA CV17-00308 JAK (AFMx) | Date | September 18, 2018 |
|---|---|---|---|
| Title | Jason Lust v. Animal Logic Entertainment US, et al. | | |

As noted, the SFA provided that Lust's "services related to film, television, interactive, gams and other entertainment related media IP projects will be exclusive for the Term" of the agreement, and that "Copyright and all related IP" he developed during that term would be assigned to ALE LLC. Shaeffer Decl., Ex. 1: Dkt. 91-1 at 3. It is undisputed that the *Nemesis* and *Claus* were not subject to the carve-out provision in the SFA that excluded certain projects from Lust's assignment obligations. It is also undisputed that the two-year term of the SFA had not expired when Lust was initially asked to execute these COEs. It is also undisputed that studios often refuse to move ahead on projects until they have received all outstanding COEs because of the risk of disputes as to ownership over the intellectual property. *See* Lust Dep. at 243:4–24; Rosen Dep. at 43:6–18; Dkt. 91-3 at 80, 91-33 at 5.

Lust argues that the AL Parties have not met their burden of demonstrating when the supposed breach occurred, *i.e.*, when Lust failed to sign the COEs, and whether his refusal to do so preceded the AL Parties' breach of the SFA's express provisions and implied covenants. Dkt. 110 at 17–18. Lust also argues that he agreed to sign the COEs if he were provided the current drafts of the producer agreements for *Nemesis* and *Claus* and if these agreements complied with the obligations of ALE LLC to Lust under the SFA. Lust contends that, because ALE LLC refused to ensure that the producer agreements complied with the SFA, he did not sign the COEs.

It appears that Lust is arguing that his nonperformance of his assignment obligations under the SFA was excused because Nalbandian and ALE LLC had failed to perform their obligations under the SFA. However, Lust does not identify what provisions in the SFA were violated by the *Nemesis* and *Claus* producer agreements, nor does he state what actions taken by Nalbandian and ALE LLC in seeking his execution of the *Nemesis* and *Claus* COEs violated the SFA. In the absence of such information, it cannot be determined that Lust was excused from performing his duty under the SFA to assign his rights in *Nemesis* and *Claus*. As noted, the execution of a long-form agreement was not a condition precedent to Lust's obligation to assign his rights to projects developed during his time working with ALE LLC.

Turning to the timing of Lust's alleged breach, it is undisputed that Lust and Cornish exchanged several emails in September 2014 regarding the *Nemesis* and *Claus* COEs, that Lust was aware of outstanding requests that he execute them, that Lust had asked his attorney to review the COEs and related draft producer agreements and that Lust had not yet executed either COE as of September 22, 2014. Shaeffer Decl., Ex. 30; Dkt. 91-30. In late January 2015, Emanuel requested that Lust execute both COEs. Shaeffer Decl., Ex. 31; Dkt. 91-31. Freedman, Lust's litigation counsel, responded several days later, stating that Lust was reviewing them and requesting copies of the final producer agreements with Warner Bros. for the two films. Lust Decl., Ex. P; Dkt. 110-5.

It is undisputed that Lust was asked no later than September 2014 to execute the *Nemesis* COE, and no later than January 2015 to execute the *Claus* COE. It is undisputed that he did not execute either. As noted, the SFA imposes a duty on Lust to assign his intellectual property rights in projects he worked on during his collaboration with ALE LLC. However, it does not provide a process by which he is to complete such assignments or a precise time period he is permitted to take after receiving a request to assign before executing the assignment. However, there is a dispute of material fact as to whether ALE LLC and Nalbandian breached the SFA's implied covenant of good faith and fair dealing as early as March 2014, nearly six months before Lust purportedly breached the SFA by failing to execute the *Nemesis* COE. Thus, it cannot be determined as a matter of law that Lust was not excused

UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA

**REDACTED CIVIL MINUTES – GENERAL**

| Case No. | LA CV17-00308 JAK (AFMx) | Date | September 18, 2018 |
|---|---|---|---|
| Title | Jason Lust v. Animal Logic Entertainment US, et al. | | |

from this performance in light of the conduct of Nalbandian and ALE LLC. For these reasons, the Motion is **DENIED** as to the breach of contract claim in the Amended Counterclaim.

5.     <u>Third Party Complaint: Breach of Contract</u>

The AL Parties have brought a claim against SAJ for breach of contract in the amount of $100,000. Dkt. 38 ¶¶ 13, 18–21. On December 19, 2013, AL US provided SAJ with a loan of $120,000. Dkt. 38-1 at 9-14. The loan was pursuant to a written agreement, signed by Nalbandian and Lust, on behalf of, respectively, AL US and SAJ. *Id.* Pursuant to this agreement, SAJ agreed to repay the $120,000 by January 31, 2015. *Id.* It is undisputed that SAJ has only repaid $20,000 and that $100,000 is due and owing. Shaeffer Decl. ¶ 33; Ex. 32; Dkt. 91-32 at 3. Thus, the Motion is **GRANTED** as to the breach of contract claim in the Third Party Complaint against SAJ.

**IV.     <u>Conclusion</u>**

For the reasons stated in this Order, the Motion is **GRANTED IN PART**. Counsel shall confer and file a Joint Trial Report no later than October 2, 2019, which shall include the parties' respective and/or collective views on: (i) whether a mediation session would be productive and, if so, when; (ii) a proposed date for the final pretrial conference and trial; (iii) the trial estimate and whether either party is requesting that the panel be prescreened and, if so, the basis for such; and (iv) any issues that need to be addressed prior to the commencement of trial. Attached to the joint report shall be the Schedule of Dates for Civil Jury Trials, found in the Standing Order on the Court's procedures and schedules located at: http://www.cacd.uscourts.gov/honorable-john-kronstadt. The Court will set dates upon review of the report.

**IT IS SO ORDERED.**

_____ : _____

Initials of Preparer     ak